**In re Anonymous Nos. 50 D.B. 86 and 93 D.B. 86**

Disciplinary board docket nos. 50 D.B. 86 and 93 D.B. 86.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

TUMOLO, *Member,* February 22, 1988—Pursuant to rule 205(c)(5) of the Pennsylvania Rules of Disciplinary Enforcement, the disciplinary board of the Supreme Court of Pennsylvania ("board") herewith submits its findings and recommendation to your honorable court with respect to the above-captioned petitions for discipline.

## HISTORY OF PROCEEDINGS

On, August 19, 1986 the office of disciplinary counsel filed a petition for discipline at no. 50 DB 1986 charging respondent with violations of Disciplinary Rule 1-102 (A)(4) dealing with conduct involving dishonesty, fraud, deceit or misrepresentation; Disciplinary Rule 1-102(A)(6) dealing with conduct adversely reflecting on a lawyer's fitness to practice law; and, Disciplinary Rule 6-101(A)(3) dealing with neglect of a legal matter entrusted to a lawyer.

On December 24, 1986 the office of disciplinary counsel filed a petition for discipline charging respondent with violation of Disciplinary Rule 6-101(A)(3) dealing with neglect of a legal matter entrusted to a lawyer; Disciplinary Rule 9-102(B)(1) dealing with the prompt notification of a client of the receipt of the client's funds; Disciplinary Rule 9-102(B)(3) dealing with the maintenance of complete records of funds of a client coming into the possession of the lawyer and the rendering of appropriate accounts to the client regarding them; and, Disciplinary Rule 9-102(B)(4) dealing with prompt payment or delivery to a client, as requested by the client, funds in the possession of the lawyer which the client is entitled to receive.

The petitions for discipline were consolidated and a hearing on the violations was conducted by chairperson [          ], along with hearing committee members [          ] and [          ] on June 12, 1987.

On December 11, 1987, the Hearing Committee filed its report with the board and made a recommendation of a public censure to be imposed upon respondent.

No exceptions were taken by either party to the Hearing Committee's recommendation.

The report and recommendation of the Hearing Committee were considered by the board on January 15, 1988.

The board's report and recommendation is hereinafter submitted to the Supreme Court of Pennsylvania.

## FINDINGS OF FACT

With only minor exceptions not considered relevant to the recommendation hereinafter made, the findings of fact hereinafter set forth are by stipula-

tion entered into by the Office of Disciplinary Counsel and respondent.

(1) Petitioner, Office of Disciplinary Counsel, whose principal office is located at 300 North Second Street, Harrisburg, Pennsylvania, is invested pursuant to rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of attorneys admitted to practice in the commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the rules.

(2) Respondent, [          ], was born in 1940, admitted to practice law in the commonwealth of Pennsylvania in 1966, and his office is located at [          ].

## 50 D.B. 86

(3) In about June 1984, Dr. and Mrs. [A] consulted respondent in regard to the possibility of adopting a child.

(a) Shortly thereafter, respondent discovered for the [A's] that a child whom they had targeted for adoption was actually unavailable.

(b) The [A's] paid respondent $60 for the initial consultation and his services in regard thereto.

(4) On July 11, 1984, a baby boy whom the [A] hoped to adopt was born at [B] General Hospital.

(a) Dr. [A] was working at [B] General Hospital at this time as part of his residency requirements at [C] Hospital.

(b) On that same day, respondent, acting as an intermediary, contacted the biological parents in the hospital on behalf of the [A's] and they expressed a desire to place the baby for adoption, particularly with the type of adoptive parents of the general description which the [A's] fit.

(5) On July 12, 1984, respondent delivered the baby from the hospital to the home of Dr. and Mrs. [A].

(6) On Sunday, July 15, 1984, respondent caused separate consent forms to be executed by each of the natural parents.

(7) Each of the aforementioned consent forms was inadvertently dated "June" 15, 1984.

(8) On or about August 20, 1984, Dr. and Mrs. [A], as proposed adoptive parents of the baby boy, met with respondent to prepare and sign a "Report of Intention to Adopt" form. At that time:

(a) The [A's] provided respondent with the information necessary to complete the "Report of Intention to Adopt."

(b) At respondent's direction, the [A's] signed the blank "Report" outside the presence of a notary.

(c) Respondent agreed to finalize the execution of said "Report" and to file the same in Orphans' Court along with other necessary papers.

(d) The [A's] were made to understand that there was a 40-day legal waiting period after the "Report" was filed with the court before they could be granted legal custody.

(e) Respondent further informed the [A's] that this waiting period would probably be closer to a few months, as opposed to 40 days.

(9) On August 21, 1984, respondent caused the "Report of Intention to Adopt" to be completed and the previously-affixed signatures of the [A's] to be notarized, even though the [A's] were not then present.

(10) The [A's] frequently contacted respondent about the adoption by telephone during the fall of 1984 through about February 1985, and also met with him in about December 1984. On these occasions, respondent advised the [A's], inter alia, that:

(a) The Orphan's Court would send notice of termination of parental rights to the biological parents concerning the anticipated adoption, but such correspondence was not deliverable because the biological parents had changed their address;

(b) The court would send out a second notice to the biological parents;

(c) The biological parents had moved "out of state" and he would have to locate them before additional action could be taken;

(d) He had been in touch with [D] of the Orphans' Court regarding the reason for the delay in this matter;

(e) The reason for the lack of progress in this adoption was "a long backlog in the courts" and the illness of the "judge primarily responsible for adoption," or words to that effect.

(11) In early May 1985, Dr. [A] independently learned that respondent had failed to file *any* adoption papers on behalf of the [A's] with the Orphans' Court and that the court had no knowledge whatsoever of a child living in the [A] home.

(12) Thereafter, on about May 8, 1985, respondent caused to be filed with the Orphans' Court the "Report to Intention to Adopt," the incorrectly dated (of which respondent was unaware) consent forms of the biological parents and a "Report of Intermediary," which had been completed by respondent and notarized on August 24, 1984.

(a) That said filing was in violation of rule 30 of the [          ] County Rules of Local Court that required the filing of the "Report of Intention to Adopt" within 30 days of the date when the child came into the possession or custody of the person filing the report.

(b) That said late filing caused or substantially contributed to the extraordinary or unusual delay in the adoption process.

(13) During May and June 1985, Dr. [A] continued to frequently telephone respondent seeking information about the progress of the adoption.

(14) In about June 1985, respondent spoke with the [A's]. At this time:

(a) Respondent advised the [A's] that a report from Dr. [E], an obstetrician at [B] General Hospital, would be required by the court in this adoption proceeding.

(b) Respondent further stated that he had been unable to contact Dr. [E] by telephone regarding this matter, and that the adoption proceedings were now delayed because of his inability to contact Dr. [E].

(15) Thereafter, Dr. [A] joined respondent in attempting to reach Dr. [E], and respondent claims to have spoken to Dr. [E] in about June 1985.

(16) In about early July 1985, Dr [A] contacted respondent, at which time respondent advised that Dr. [E] was reluctant to complete certain required co-intermediary forms.

(a) In fact, Dr [E] was willing to complete any required forms, but had not received same from respondent.

(b) After discussing the matter with Dr. [E], Dr. [A] telephoned respondent and demanded that respondent provide him with the required forms.

(c) Upon receipt from respondent of said forms, Dr. [A] then personally delivered same to Dr. [E] for execution.

(17) In about early July 1985, respondent, upon learning of the mistake for the first time, attempted to correct the problem with the dates on the consent forms of the biological parents.

(18) On or about August 2, 1985, having learned independently that there might be a problem with the dates shown on the consent forms of the biological parents, Dr. [A] called respondent, asked whether such a problem existed, and was assured that the consent forms were in good order.

(a) That respondent intended to cure the problem of the date on the consent forms of the biological parents by filing a petition and attaching an affidavit that the date was an obvious clerical error.

(19) By letter dated August 2, 1985, Dr. [A] advised respondent that he and his wife were discharging respondent as their attorney in the adoption matter, because they were dissatisfied with the progress of the adoption and respondent's services.

(20) The [A's] thereafter retained attorney [F] to represent them in the adoption proceeding.

(21) On August 27, 1985, respondent withdrew his appearance and [F] entered his appearance as counsel for the [A's].

## 93 D.B. 86

(3) In the estate of [G], who died in October of 1981, respondent was both executor and attorney for the estate.

(a) Advanced distribution of the bulk of the assets ($18,000) had been made by January 1985.

(b) As of the time of the decree of distribution (dated July 1, 1985), the only distribution yet to be made was in the amount of $2,947.88, of which $2,368.66 represented prospective monthly payments of $129 to be made by [H] through December 1986.

(4) [G] bequeathed and devised 60 percent of his estate to his niece, [I]. The remaining 40 percent of his estate was bequeathed in four equal shares to a grand-nephew, two other nieces, and a friend, [J].

(5) By letter dated August 13, 1985, respondent advised the beneficiaries if the [G] estate that:

(a) The Orphan's Court had decreed final distribution in the total sum of $2,947.88;

(b) $754.88 of the $2,947.88 was being distributed to the heirs at that time;

(c) The balance ($2,193.00) would be paid in 17 installments to respondent of $129 per month from [H], who had purchased the [G] home in [    ];

(d) As the payments were received by respondent from [H], they would "be distributed quarterly," with [I] receiving $232.20 per quarter and the other four beneficiaries each receiving $38.70 per quarter.

(6) With respondent's August 13, 1985 letter, he enclosed separate checks payable to [I] in the amount of $452.92, and to the other beneficiaries in the amount of $75.49.

(7) In about November 1985, respondent was due to make a quarterly distribution of the funds from the sale of the [G] home to the beneficiaries, but failed to do so.

(8) By letter dated February 18, 1986, [K], Esq. wrote to respondent on behalf of [I] (the 60 percent beneficiary).

(a) Therein, [K] reminded respondent that [I] had not received distribution since August 1985 and asked respondent to advise him of the status of this matter and when the beneficiaries could expect to receive distribution.

(b) Respondent failed to respond to [K's] letter.

(9) [K] again wrote to respondent by letter dated May 15, 1986.

(a) Therein, [K] reminded respondent that [I] had not received distribution since August 1 and asked respondent to advise him of the status of this matter

and when the beneficiaries could expect to receive distribution.

(b) He also advised respondent that a disciplinary complaint would be filed against him if he failed to provide pertinent information to [I] (or [K]) within ten days.

(c) Respondent failed to respond to [K's] letter.

(10) By letter dated August 7, 1986, respondent wrote to the heirs of the [G] estate.

(a) Therein, he indicated that, along with the letter, he was sending separate checks to each of the heirs, representative of their proportionate share of the funds received from [H]. He also indicated that additional payments would be forwarded to the heirs from the payments on the [H] installment note.

(b) Enclosed with the letter were checks in the amount of $616.80 to [I] and $102.80 to the other four heirs.

(11) Respondent received payments from [H] but did not, in most cases, timely negotiate said checks. Specifically:

(a) Checks from [H] to respondent dated May 11 and June 9, 1985 were processed by the bank on June 11, 1985; and,

(b) Checks from [H] to respondent dated August 18, 1985, September 14, 1985, October 15, 1985 and December 13, 1985 and February 12, 1986 and March 12, 1986 were all processed by the bank on March 14, 1986.

## CONCLUSIONS OF LAW

(1) Respondent has stipulated in both proceedings that he has violated rule 6-101(A)(3). The board is in concurrence with the hearing committee that the record entirely supports the stipulation.

(2) The board is compelled to conclude that in disciplinary proceeding 50 D.B. 86, that the respondent violated rule 1-102(A)(4) in that he made numerous representations to the [A's] concerning the status of the pending adoption proceeding and the reasons for the delay therein which were not the truth.

(3) The board concurs in the finding of the hearing committee that the evidence is not sufficient to support "a request for or requirement of an accounting during the period of time in question" and thus finds that there is no violation of rules 9-102(B)(1) and 9-102(B)(3).

## DISCUSSION

Respondent had a past disciplinary history involving three admonitions and one private reprimand. It is noted that the disciplinary history involves the same conduct as is presently before the board for adjudication, i.e., neglect and misrepresentation.

In the case of neglect, involving misrepresentation to conceal the infraction, where there has been no substantial client injury, a public censure has been the disciplinary recommendation. See *In re Anonymous No. 12 D.B. 76,* 8 D.&C.3d 294 (1977); *In re Anonymous No. 65 D.B. 75,* 7 D.&C. 3d 519 (1977); and, *In re Anonymous No. 35 D.B. 76,* 4 D.&C.3d 780 (1977).

The more troublesome inquiry here is the past disciplinary history. Has the respondent shown sufficient resolve to amend his ways so that the public will be protected?

In the dispositional phase of the hearing, respondent presented the testimony of Dr. [L], a clinical psychologist whom respondent had seen personally on two occasions and with whom the

respondent had participated in group therapy on five or six occasions. The psychologist's testimony shows that the respondent's procrastination results from his fear of the task that he has been engaged by a client to perform. In addition, as is the case, in many psychological evaluations, Dr. [L] can make no prediction by any degree of reasonable certainty as to the likelihood that the group therapy will be successful. However, he does offer at page 128 of the transcript that [respondent] "absolutely impressed me as genuine, very sincere." There is no doubt respondent is making the effort to resolve his problems, and that his psychologist is impressed with his resolve.

In addition, respondent was able to present testimony from clients and fellow practitioners that his reputation and legal competence was considered outstanding in the community. He obviously has done other legal tasks very well.

After careful consideration of the entire record, noting the fact that exceptions have not been filed by either party, and being impressed that respondent is making substantial effort on his own to cure the underlying difficulties which have caused his disciplinary offenses, the board unanimously adopts the recommendation of the hearing committee.

## RECOMMENDATION

Based on the foregoing discussion, the disciplinary board recommends that the respondent be subjected to public censure by the Supreme Court of Pennsylvania, and that he be made to pay the costs of these proceedings.

## ORDER

And now, July 15, 1988, upon consideration of the report and recommendation of the disciplinary

board dated February 22, 1988, it is hereby ordered that [respondent] be and he is suspended from the bar of this commonwealth for a period of three months, and he shall comply with all the provisions of rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the disciplinary board pursuant to rule 208(g), Pa.R.D.E.